**UNITED STATES of America,
Plaintiff,**

v.

**EL PASO NATURAL GAS COMPANY**
and Pacific Northwest Pipeline Cor-
poration, Defendants.

**Civ. A. No. 143–57.**

United States District Court
D. Utah, C. D.

June 21, 1968.

As Amended Aug. 29, 1968.

See also, D.C., 37 F.R.D. 330.

Joseph J. Saunders, John H. Dougherty, Milton J. Grossman, Robert D. Paul, Attys., Department of Justice, Washington, D. C., for plaintiff.

Leon M. Payne, A. H. Ebert, Jr., P. Dexter Peacock, Andrews, Kurth, Campbell & Jones, Houston, Tex., Gregory A. Harrison, David F. Mackie, Brobeck, Phleger & Harrison, San Francisco, Cal., G. Scott Cuming, General Counsel, E. G. Najaiko, Asst. General Counsel El Paso Natural Gas Co., El Paso, Tex., Dennis McCarthy, Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, Utah, for defendant.

Darrell F. Smith, Atty. Gen., H. J. Lewkowitz, Asst. Atty. Gen. State of Arizona, Phoenix, Ariz., for intervenors State of Arizona ex rel. The Arizona Corporation Commission, Arizona Public Service Co., Tucson Gas & Electric Co.

Nicholas H. Powell, Snell & Wilmer, Phoenix, Ariz., for Arizona Public Service Co.

A. Y. Holesapple, Holesapple, Conner, Jones, McFall & Johnson, Tucson, Ariz., for Tucson Gas & Electric Co.

Louis H. Callister, Callister, Kesler & Callister, Salt Lake City, Utah, for Arizona Public Service Co. and Tucson Gas & Electric Co.

John T. Miller, Jr., Washington, D. C., for State of Arizona ex rel. Arizona Corporation Commission, Arizona Public Service Co., Tucson Gas & Electric Co.

Thomas C. Lynch, Atty.Gen. of State of California, William M. Bennett, Sp.

Counsel to Atty. Gen., Iver E. Skjeie, Deputy Atty. Gen., Sacramento, Cal., for the People of State of California.

James E. Faust, Salt Lake City, Utah, for California-Pacific Utilities Co.

Mary Moran Pajalich, J. Calvin Simpson, Sheldon Rosenthal, San Francisco, Cal., for Public Utilities Commission of State of California.

Richard B. Hooper, Wilbert C. Anderson, Jones, Grey, Kehoe, Bayley, Hooper & Olsen, Seattle, Wash., for Cascade Natural Gas Corporation.

Duke W. Dunbar, Atty. Gen., State of Colorado, Robert Lee Kessler, Asst. Atty. Gen., State of Colorado, Denver, Colo., for State of Colorado ex rel. Colorado Public Utilities Commission.

Allan G. Shepard, Atty. Gen., State of Idaho, Larry D. Ripley, Asst. Atty. Gen., assigned to Idaho Public Utilities Commission, c/o Idaho Public Utilities Commission, Boise, Idaho, for State of Idaho ex rel. Idaho Public Utilities Commission.

Claude Marcus, Marcus, Leggat & Marcus, Boise, Idaho, for Intermountain Gas Co.

Joseph S. Jones, Salt Lake City, Utah, for Mountain Fuel Supply Co.

Harvey Dickerson, Atty. Gen. of Nevada, John Sheehan, Deputy Atty. Gen., Carson City, Nev., for Public Service Commission of Nevada.

Boston E. Witt, Atty. Gen. of New Mexico, Dennis R. Francish, Special Asst. Atty. Gen., Santa Fe, N. M., for New Mexico Public Service Commission.

Harold W. Pierce, Portland, Ore., for Northwest Natural Gas Co.

Robert Y. Thornton, Atty. Gen. of Oregon, Richard W. Sabin, Asst. Atty. Gen., Salem, Ore., for State of Oregon ex rel. The Public Utility Commissioner of Oregon.

Richard H. Peterson, Frederick T. Searls, Malcolm H. Furbush, Stanley T. Skinner, San Francisco, Cal., for Pacific Gas and Electric Co.

Sherman Chickering, C. Hayden Ames, Donald J. Richardson, Jr., Chickering & Gregory, San Francisco, Cal., for San Diego Gas & Electric Co.

Rollin E. Woodbury, William E. Marx, Los Angeles, Cal., R. Clyde Hargrove, Shreveport, La., for Southern California Edison Co.

John Ormasa, Harvey L. Goth, Los Angeles, Cal., Neil R. Olmstead, Olmstead, Stine & Campbell, Ogden, Utah, of counsel, for Southern California Gas Co. and Southern Counties Gas Company of California.

Charles H. McCrea, Vice-President and General Counsel, Las Vegas, Nev., for Southwest Gas Corporation.

Edward F. Richards, Gustin & Richards, Salt Lake City, Utah, for Utah Gas Service Co.

Phil L. Hansen, Atty. Gen., State of Utah, H. Wright Volker, Asst. Atty. Gen., Salt Lake City, Utah, for Utah Public Service Commission.

Cartano, Botzer & Chapman, John W. Chapman, Seattle, Wash., Draper, Sandack & Saperstein, A. Wally Sandack, Salt Lake City, Utah, for Washington Natural Gas Co.

John J. O'Connell, Atty. Gen., Frank P. Hayes, Robert E. Simpson, Asst. Attys. Gen., Olympia, Wash., for Washington Utilities and Transportation Commission.

Robert L. Simpson, Paine, Lowe, Coffin, Herman & O'Kelly, Spokane, Wash., A. Wally Sandack, Salt Lake City, Utah, for Washington Water Power Co.

Don M. Empfield, Sp. Asst. Atty. Gen. State of Wyoming, Cheyenne, Wyo., for Public Service Commission of Wyoming.

Richard A. Solomon, General Counsel, Washington, D. C., for Federal Power Commission, amicus curiae.

Henry S. Nygaard, Salt Lake City, Utah, Frank Shafroth, Grant, Shafroth, Toll & McHendrie, Denver, Colo., David T. Searls, Vinson, Elkins, Weems & Searls, Houston, Tex., for Aspen Pipeline Co.

David K. Watkiss, Salt Lake City, Utah, Risher M. Thornton, III, Midland, Tex., James D. McKinney, Washington, D. C., for Colonial Group.

Walter W. Sapp, General Counsel, Colorado Springs, Colo., James L. White, William J. Carney, Jr., Holland & Hart, Denver, Colo., Macoy A. McMurray, McKay & Burton, Salt Lake City, Utah, for Colorado Interstate Gas Co.

B. J. Bradshaw, William Howard Wolf, Fulbright, Crooker, Freeman, Bates & Jaworski, Houston, Tex., Calvin A. Behle, Parsons, Behle, Evans & Latimer, Salt Lake City, Utah, for Continental Pacific Corporation.

Oscar W. Moyle, Jr., Hardin A. Whitney, Jr., O. Wood Moyle, III, Salt Lake City, Utah, for Great Lakes Carbon Corporation.

Wm. H. Ferguson, Thomas J. Greenan, Ferguson & Burdell, Seattle, Wash., Ted Stockmar, Holme, Roberts & Owen, Denver, Colo., for Pacific Western Pipeline Corporation.

C. Keefe Hurley, Earle C. Cooley, Hale & Dorr, Boston, Mass., Brigham E. Roberts, Rawlings, Roberts & Black, Salt Lake City, Utah, for Paradox Production Corporation.

C. Preston Allen, S. J. Quinney, Ray, Quinney & Nebeker, Salt Lake City, Utah, Thompson, Knight, Simmons & Bullion, Dallas, Tex., George S. Dibble, Jr., Cody, Wyo., for Joseph Rosenblatt et. al., Husky Oil Co. Group.

Alfred H. Stoloff, Phillips, Coughlin, Buell & Phillips, Portland, Ore., Fred D. Turnage, Cleary, Gottlieb, Steen & Hamilton, Washington, D. C., for Western States Pipeline Corporation.

CHILSON, District Judge.

PRELIMINARY STATEMENT

The following is a brief summary of the facts and background which lead to the present phase of this litigation. A more detailed account is found in three decisions of the Supreme Court:

California v. Federal Power Commission, 369 U.S. 482, 82 S.Ct. 901, 8 L.Ed.2d 54; United States v. El Paso Natural Gas Co. et al., 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12; Cascade Natural Gas Corp. v. El Paso Natural Gas Co. et al., 386 U.S. 129, 87 S.Ct. 932, 17 L.Ed.2d 814. (Referred to as Cascade)

Prior to the year 1954, El Paso Natural Gas Company (El Paso) was engaged in the business of transporting natural gas interstate to the California border for sale to distributors who distributed the gas to users in southern California. At that time, El Paso was the sole out-of-state supplier to the California market.

In 1954, Pacific Northwest (PNW) received the approval of the Federal Power Commission to construct and operate a pipeline from the San Juan Basin in New Mexico to the State of Washington to supply gas to the then unserved Pacific Northwest area. The pipeline was completed and service was begun in 1956.

PNW had obtained authorization to receive large quantities of Canadian gas and, in addition, had acquired Rocky Mountain gas reservoirs along its route and gas reserves in the San Juan Basin. In 1954, PNW tried to enter the rapidly expanding California market by transportation of Canadian gas to Pacific Gas & Electric Co. (PG & E) in northern California, and the effort was renewed in 1955. In 1956, PNW negotiated with Southern California Edison Co. (Edison) to supply it with natural gas.

Although PNW had no pipeline into California and its efforts to enter the California market were unsuccessful, these efforts were a substantial competitive factor in the California market and led to a price reduction and other concessions to the ultimate benefit of Edison.

El Paso had been interested in acquiring PNW since 1954. The first offer from El Paso was in December 1955, an offer PNW rejected. Negotiations were resumed by El Paso in the summer of 1956, while PNW was still trying to obtain entry to the California market.

In November of 1956, El Paso offered to exchange El Paso shares for PNW shares. This offer was accepted by

PNW directors and by May 1957, El Paso had acquired 99.8 percent of PNW's outstanding stock.

In July 1957, the Department of Justice filed suit against El Paso in the U. S. District Court for the District of Utah charging that the stock acquisition violated Section 7 of the Clayton Act.

In August 1957, El Paso applied to the Federal Power Commission for permission to acquire the assets of PNW, and on December 23, 1959, the Commission approved and the merger of PNW with El Paso was effected on December 31, 1959. California, an intervenor in the proceedings, obtained a review by the Court of Appeals, which affirmed the Commission (111 U.S.App.D.C. 226, 296 F.2d 348). The Supreme Court granted certiorari and set aside the Commission's approval, holding that it should not have acted until the District Court had passed on the Clayton Act issues. California v. Federal Power Commission, 369 U.S. 482, 82 S.Ct. 901 (supra).

Meanwhile, (in October 1960) the United States amended its Complaint in the District Court so as to include the asset acquisition by merger in the charge of violation of the Clayton Act. Upon trial of this action, the District Court found for El Paso; the U. S. appealed; the Supreme Court, on review of the record which was composed largely of undisputed evidence, concluded that the effect of the acquisition "may be substantially to lessen competition" within the meaning of Section 7 of the Clayton Act, reversed the judgment and remanded with directions to the District Court "to order divestiture without delay." United States v. El Paso Natural Gas Company et al., 376 U.S., p. 651, 84 S.Ct. 1044 (supra).

Upon remand to the District Court, motions to intervene by the State of California, Southern California Edison Company, (Edison) and Cascade Natural Gas Company (Cascade Company) were denied, and the District Court entered a decree of divestiture which had been agreed upon by the Department of Justice and El Paso.

California, Edison, and Cascade Company appealed from the denial of their motions to intervene. The Supreme Court in Cascade Natural Gas Corporation v. El Paso Natural Gas Company et al., 386 U.S. 129, 87 S.Ct. 932 (supra) reversed the District Court and remanded with directions to allow each appellant to intervene as a matter of right and that the proceedings be reopened to give California, Edison, and Cascade Company an opportunity to be heard as intervenors.

The Court also held that the agreed decree, entered by the District Court, was not in accord with the Supreme Court's mandate in 376 U.S. 651, 84 S. Ct. 1044 (supra) which required that PNW, or a new company, be at once restored to a position where it could compete with El Paso in the California market; ordered the District Court to vacate the orders of divestiture previously entered; "have de novo hearings on the type of divestiture" the Court envisioned and made plain in its opinion in 376 U.S. 651, 84 S.Ct. 1044; directed " * * * there be a divestiture without delay * * * "; suggested guidelines that should be followed in ordering the divestiture and ordered that a different District Judge be assigned to hear the case.

## PROCEEDINGS SINCE CASCADE

(For further detail see APPENDIX)

On April 18, 1967, the undersigned was assigned to the District of Utah to conduct the further proceedings required by Cascade.

After a conference with counsel on June 9, 1967, the Court granted 26 Motions to Intervene; continued the Federal Power Commission as amicus curiae; ordered El Paso to file a plan for divestiture by August 4, 1967; ordered those desiring to acquire the divested properties (applicants for acquisition) to file proposals by August 25, 1967; and permitted intervenors until September 18,

1967, to file comments on the proposals made and to make proposals of their own.

On October 3, 1967, a pre-hearing conference was had; the "de novo" hearings were commenced on October 16, 1967, in Ogden, Utah; were recessed on November 15, 1967; were resumed on January 8, 1968, in Denver, Colorado, and the taking of evidence was concluded March 21, 1968.

Briefs were filed—the last one on May 25, 1968, and oral argument was had on June 3, 1968.

In addition to the plaintiff and defendant, the Federal Power Commission as amicus curiae, 22 intervenors and 9 applicants for acquisition participated in all or a part of the hearings.

The names of the participating intervenors and applicants for acquisition are set forth in the APPENDIX.

## SUMMARY OF PLANS PROPOSED

In accordance with the procedure prescribed by this Court, El Paso filed a divestiture plan (El Paso Exhibit 1) which is here summarized.

Thereafter, the applicants for acquisition filed their proposed plans, followed by the comments of intervenors, some of which made specific suggestions concerning the plans proposed. Edison suggested two alternate plans for divestiture.

## SUMMARY OF EL PASO PLAN

*Transfer of Assets to New Company*

El Paso proposes to transfer to a corporate entity referred to herein as "New Company", all of the operating property acquired from Pacific Northwest and additions thereto, $5,000,000 for working capital, designated gas reserves, and certain other assets in exchange for all of New Company's common stock and New Company's assumption of approximately $170,000,000 face amount of El Paso's bond and debenture indebtedness, plus the cost of transferring this debt from El Paso to New Company (roll over cost) of an increase in the interest rate of one-eighth of one percent.

El Paso would sell up to 20 percent of New Company's common stock to the successful applicant selected by the Court, and the balance of eighty percent or more would be deposited by El Paso in a voting trust to be administered under Court supervision by a trustee who would be wholly independent of El Paso and who may, with the approval of the Court, be the purchaser.

Non-voting certificates of participation in the voting trust would be issued and distributed by El Paso to its common shareholders. These participation certificates would be exchangeable for the underlying shares of New Company common stock under Court-approved provisions which would effectively preclude El Paso, its officers, directors, and common shareholders from acquiring any shares of New Company common stock.

The voting trust would terminate at the end of ten years, at which time any remaining New Company shares not exchanged would be sold by the trustee for the benefit of the remaining certificate holders.

The limitation of the sale of New Company stock to a maximum of 20 percent and placing the balance in a voting trust for the benefit of El Paso stockholders is designed to qualify the divestiture as a "D" type reorganization under Section 368 and a spin-off under Section 355 of the Internal Revenue Code, which under Section 361 of the Code would result in no taxable income to El Paso on the transfer of the assets to New Company. A sale of more than 20 percent of the New Company stock would not comply with the requirements of Section 368(c) of the Code, hence the 20 percent limitation.

The voting trust is proposed as the means to comply with the requirement of Cascade that New Company be insulated from domination by El Paso or its stockholders.

*Sale Price of New Company Stock*

The sale of up to 20 percent of New Company stock would be at a negotiated price. El Paso proposes that the Court select those applicants which it finds qualified and allow El Paso to negotiate

separately with each of them and present to the Court the agreements negotiated. The Court would select the successful applicant, presumably the one paying the highest price.

### Divestiture

The successful applicant would then acquire the management of New Company, and El Paso and New Company would file applications with Federal Power Commission for authority to transfer the divested properties to New Company for operation.

### Westcoast and Northwest Production Stock

El Paso proposes to sell this stock to persons satisfactory to the Court as soon as practicable after the Court approves the plan of divestiture.

### Reimbursement for Use of PNW's Tax Losses

El Paso proposes no reimbursement to New Company for its use of PNW's tax losses. El Paso claims that the tax losses were used to maintain lower rates in the northwest division than otherwise would have been possible and thereby the benefits of the utilization of the tax losses were largely flowed through to the gas consumers in the northwest.

### Inter-Company Contracts

El Paso proposes to reinstate the Sumas Exchange Agreement which provides for the purchase by El Paso of 100,000 MCF per day from New Company's reserves in the San Juan Basin and to reinstate the CIG contract, whereby New Company will honor an obligation of PNW to transport and deliver from the San Juan Basin to CIG at Rock Springs, Wyoming, a certain amount of gas.

El Paso also proposes negotiation of a mutual gas gathering agreement in the San Juan Basin on a cost-of-service basis.

(These contracts and their disposition are discussed in detail later in this opinion.)

### GAS RESERVES

El Paso proposes to divest to New Company the following gas reserves:

1. All reserves attributable to all gas supply sources now held by El Paso in the San Juan Basin and elsewhere as a result of the acquisition of PNW stock, both in the form of leaseholds and contracts for the purchase of gas;

2. All contracts negotiated since January 1, 1957, for Canadian gas and for all other gas supplies located north of Ignacio, Colorado;

3. A division of the gas reserves in the San Juan Basin.

### SUMMARY OF OTHER PLANS

During the course of the hearings, some plans were modified from the original proposals; but the final briefs of the applicants contain a summary of the plans as finally submitted. However, all applicants for acquisition stated that they desire to be considered as applicants under any plan which the Court might devise. With this qualification, the Court summarizes the more pertinent parts of the plans submitted for the Court's consideration.

### SUMMARY OF ASPEN PLAN

Aspen accepts El Paso's proposal to convey the assets to be divested to New Company, with New Company assuming the bond and debenture indebtedness as proposed by El Paso. El Paso would receive all of the stock of New Company, except an amount to be determined by the Court which would go to the founders of Aspen as founders' shares. Aspen suggests three percent. The remainder of the New Company stock would be deposited by El Paso in a voting trust as proposed, but the trust would be limited to five years. Aspen's plan eliminates the sale of any New Company stock by El Paso.

At an appropriate time, Aspen would merge with New Company.

The West Coast and Northwest Production stock would be divested to New Company, sold by it, and the net proceeds after payment of taxes would be used as working capital.

Aspen desires no reimbursement for El Paso's utilization of PNW's tax losses.

Aspen accepts El Paso's proposals regarding the inter-company contracts.

Aspen accepts El Paso's division of the gas reserves as fair and equitable.

### SUMMARY OF COLONIAL'S PLAN

Colonial accepts El Paso's proposal with certain modifications, and is prepared to purchase up to 20 percent of the New Company stock at a negotiated or Court-determined price.

West Coast stock should be transferred to New Company at book value and sold by New Company.

As to inter-company contracts, Colonial suggests the reinstatement of the Sumas Exchange Agreement with an option to cancel on 18 months' notice; reinstatement of Colorado Interstate Contract; non-reinstatement of Kingsgate Agreement and reinstatement of the San Juan Gathering Agreement at the old price subject to negotiation under the requirements of the natural gas act.

Colonial believes that the total gas reserves to be divested have been overestimated, and that the New Company-San Juan reserves should be supplemented; or, there should be an exchange of New Company Basin-Dakota reserves for additional Mesaverde reserves. El Paso should convey to New Company the exploratory acreage acquired by El Paso since the stock acquisition in basins located in the northwest division area.

### SUMMARY OF COLORADO INTERSTATE PLAN

CIG accepts El Paso's proposals with substantial modifications.

CIG proposes to furnish its own working capital.

CIG would reimburse El Paso for the divested assets at fair market value to be determined by negotiation with El Paso.

CIG would accept El Paso's proposal that the assets be divested to New Company; New Company assume approximately $170,000,000 of the debt and debenture indebtedness, plus the roll over cost. For its equity, El Paso would receive preferred stock of New Company convertible into CIG common. CIG would receive 100 percent of the New Company common stock in exchange for $5,000,000 in cash plus sufficient stock of CIG to satisfy the conversion requirements of New Company preferred stock.

Appropriate restrictions would be included in the divestiture decree to insulate New Company and CIG from domination or control by El Paso, its directors, officers, or major stockholders.

CIG proposes the acceptance of El Paso's division of the gas reserves, subject to modification of the Sumas Exchange Agreement, either by reducing deliveries to 50,000 MCF per day, commencing in 1971 and terminating after 1973, or an option by CIG to cancel the agreement on reasonable notice.

CIG accepts El Paso's proposal with reference to the West Coast and Northwest Production stock, the tax loss carry over, and the inter-company contracts, except for the proposed modification of the Sumas Exchange Agreement.

### SUMMARY OF CONTINENTAL-PACIFIC (COPACO) PLAN

Copaco accepts the El Paso plan with modifications.

Copaco would merge into New Company and Copaco stockholders would, as a result of the merger, receive common stock of New Company on the basis of one share for each $12.50 of capital provided to New Company by Copaco. Thus, Copaco would obtain 480,000 shares of New Company stock (9.16 percent); New Company by the merger would receive $6,000,000 in cash, and El Paso would receive 90.84 percent of the New Company stock. El Paso would have the right, subject to Court approval, to sell approximately 10 percent of the New Company stock or offer to exchange that much with El Paso shareholders for El Paso common. The remaining New Company stock (80 percent or more) would be placed in a voting trust as proposed by El Paso.

Copaco does not propose divestment of West Coast and Northwest Production stock to New Company and does not propose a reimbursement by El Paso for the

use of PNW's tax losses; but should such a reimbursement be made, it should be used as a reserve to lower the book value of the property to be divested by El Paso.

### SUMMARY OF GREAT LAKES PLAN

Great Lakes adopts the El Paso plan including the non-divestment of West Coast and Northwest Production stock and no reimbursement for tax loss carry over. However, Great Lakes suggests that the voting trust should be for a period of 10–15 years; that there should be an independent trustee and that the trustee should not be controlled either by El Paso or New Company.

### SUMMARY OF PACIFIC WESTERN'S PLAN

Pacific Western proposes the assumption of a proportionate part of El Paso's bond and debenture indebtedness and a cash purchase of the equity. The purchase price would be based on book value of the utility assets and West Coast stock; or, if the Court so decides, the fair market value. The funds for the purchase would be obtained from a public sale of Pacific Western stock.

As an alternative plan, Pacific Western proposes to acquire the equity in the divested assets by a stock exchange as follows:

1. Pacific Western would exchange its stock with El Paso stockholders in return for all of their El Paso stock.

2. El Paso would transfer the assets and related liabilities to New Company in return for 100 percent of New Company stock.

3. El Paso would transfer the stock of New Company to Pacific Western, solely in exchange for the shares of El Paso acquired by Pacific Western.

4. Pacific Western would merge with New Company.

Pacific Western believes such an exchange is a tax-free transaction.

West Coast stock should be sold by El Paso and the net profit after taxes should be credited to New Company.

Northwest Production stock to be retained by El Paso.

El Paso may retain Pacific Northwest Realty stock, Phillips Pacific stock, and the Prairie Pipeline, Prairie Transmission, and Specialty Products stock.

El Paso should reimburse New Company to the extent of $4,972,000 for El Paso's use of the tax loss carry over.

As to inter-company contracts, Pacific Western suggests reinstatement of the CIG contract and Sumas Exchange Agreement, but the latter with an option to cancel. The San Juan Gathering Agreement should be reinstated at $.04½ per MCF with any price differential determined by the Federal Power Commission to be retroactive.

The Kingsgate Exchange Agreement should be reinstated.

#### Gas Reserves

Pacific Western takes the position that El Paso's estimate of the gas reserves to be divested of 9.2 TCF is overestimated and that El Paso should guarantee to New Company, total reserves in the amount of 9.2 TCF, and that New Company should have an option to cancel the Sumas Exchange Agreement.

### SUMMARY OF PARADOX PLAN

Paradox proposes a cash purchase of El Paso's equity. Paradox would assume $170,000,000 of El Paso's indebtedness and pay cash for the equity at book value ($61,000,000) plus an amount equal to the book value of the stock of West Coast Transmission; or, Paradox would pay cash up to $73,000,000 plus an amount equal to the book value of the stock of West Coast.

The funds would be raised through an underwriting and sale of Paradox stock to the public.

### SUMMARY OF ROSENBLATT-HUSKY PLAN

Accepts the El Paso plan, with modifications.

West Coast stock should be divested to New Company for working capital, "at a

value equal to the net realizable proceeds from the sale of those shares."

There should be some reimbursement for El Paso's use of PNW tax losses.

There should be three voting trustees to be designated by the Board of Directors or the Executive Committee of Rosenblatt-Husky.

## SUMMARY OF WESTERN STATES' PLAN

Accepts the El Paso plan and would propose to purchase 20 percent of the common stock of New Company (less founders' shares). The funds for the purchase would be obtained through a nationwide public offering of Western States' stock.

In the alternative, Western States would acquire all of the common stock of New Company. Up to 20 percent of the stock would be purchased for cash derived from the proceeds of a public offering of Western States' stock. The balance of 80 percent or more would be acquired by an exchange of El Paso stock for the New Company stock. The El Paso stock would be acquired by an exchange of Western States' stock for El Paso stock, the offer of exchange being made to El Paso stockholders.

Western States proposes that El Paso pledge the West Coast stock as security for an open line of credit which could be drawn upon by New Company for interim expenses. At the time of closing, this stock would be released from the pledge and sold as directed by the Court, with El Paso paying off the borrowings. Also, El Paso should stand Western States' interim expenses until the actual take-over.

With these provisions, El Paso should retain the West Coast stock and also the stock of the Northwest Production Company.

Western States does not request any reimbursement for the use of PNW tax losses.

Sumas Exchange Agreement should be reinstated with option to terminate on reasonable notice.

## SUMMARY OF PLANS PROPOSED BY EDISON

In its original comments, Southern California Edison Company proposed two plans. The first proposed that the Court designate a specific purchaser from among the applicants, and that all of the assets to be divested be transferred to the successful applicant's corporation in exchange for its bonds and debentures in an amount to be fixed by the Court and a specified percentage of the common stock of the acquiring corporation. The bonds and debentures received by El Paso would be exchanged by it for retirement of its own bonds and debentures in a manner similar to what El Paso proposes. The percentage of stock to be retained by the successful applicant should fairly reflect the effort expended, the expense incurred, and the risk taken.

The second plan is a slight variation of the El Paso plan. It would transfer the assets to New Company in exchange for New Company's common stock and an assumption of El Paso's bond and debenture indebtedness in the amount of $150,000,000 instead of $170,000,000 as proposed by El Paso. All of the stock of New Company would be deposited with a trustee. As soon as possible thereafter, the trustee would make a public offering through underwriter of 80 percent of the stock held by it, and as soon as the price for the 80 percent is established, the trustee will then sell the remaining 20 percent of the stock to the successful applicant at the net amount per share El Paso will realize from the public sale.

In its final brief, El Paso suggests that its alternate plan be modified to allow El Paso to dispose of the New Company stock as it sees fit, so long as it disposes of all the stock within a period of one year from the date of divestiture.

## OTHER SUGGESTIONS OF INTERVENORS

The intervenors have made many and varied suggestions for modifications in the El Paso plan and suggestions for

the Court's consideration in devising a plan for divestiture. Time does not permit nor would any good purpose be served by a discussion of them. They have been considered by the Court and, together with the evidence, constitute the basis for the Court's determination.

## PROPERTY TO BE DIVESTED

El Paso proposes to divest to New Company the following:

### Physical Assets

The property, plant and equipment described in El Paso Exhibits 18 and 22 together with any additions, modifications, or replacements thereof subsequent to August 4, 1967.

### Gas Sales Agreements

All gas sales contracts with any customer connected to any of the facilities to be divested to New Company existing at the effective date of the divestment.

### Investments

(See APPENDIX for further detail.)

1. 49 percent of the capital stock of Phillips Pacific Chemical Co., which owns a fertilizer plant near Hedges, Washington;

2. All of the capital stock of Pacific Northwest Realty Corporation which owns an office building in Salt Lake City, Utah;

3. Inactive subsidiaries acquired from Pacific Northwest as a result of the merger:

 Prairie Pipeline Ltd.

 Prairie Transmission Lines Ltd.

 Specialty Gas Products

The total investment in these companies is $61,000.

4. Miscellaneous club memberships representing an investment of $7,000.

These proposals have met with no objection. The Court finds that these physical assets and gas sales agreements are essential to the service of the northwest division and should be divested to New Company. The investments above described were acquired as a result of the merger, will in total contribute to the welfare of New Company, and should be divested to it.

## GAS RESERVES

El Paso, in its plan of divestiture, proposes to divest to New Company, all reserves now held by El Paso in the San Juan Basin and elsewhere as a result of the acquisition of Pacific Northwest stock, all contracts negotiated since January 1, 1957, for Canadian gas, and all other gas supplies located north of the San Juan Basin (Ignacio, Colorado), and a portion of the San Juan reserves acquired since the acquisition of PNW by El Paso.

After deducting the gas produced since January 1, 1957, to serve the northwest division markets, the gas reserves to be divested to New Company as of January 1, 1967, are estimated by El Paso to be approximately 9.2 TCF.

At Tabs 5 and 6 of El Paso's Exhibit 1, is El Paso's summary of the dedicated reserves to be divested and a comparison of remaining reserves, percentages, and reserve life indexes for divested company and El Paso. Tabs 5 and 6 are set forth on the following pages:

## TAB 5

### SUMMARY OF DEDICATED RESERVES TO BE DIVESTED

(Gas Volumes in M³cf at 14.73 psia Pressure Base and 60° F.)

| Source<br>Field and Reservoir | 1–1–67 Pipeline<br>Gas Reserves |
|---|---|
| CANADIAN | |
| West Coast Transmission–Sumas | 2,667.9 |
| West Coast Transmission–Kingsgate | 765.0 |
| | 3,432.9 |

ROCKY MOUNTAIN AREA

Big Piney Fields
| | |
|---|---:|
| Big Piney (Almy–Mesaverde) | 138.9 |
| Big Piney (Frontier-Muddy) | 2,153.2 |
| | 2,292.1 |

| | |
|---|---:|
| Piceance (Douglas Creek—Wasatch "A" & "G" | 196.2 |
| Miscellaneous Fields | 128.6 |
| | 2,616.9 |

SAN JUAN AREA

| | |
|---|---:|
| Basin Dakota Field | 1,053.7 |
| Basin Pictured Cliffs Field | 396.2 |
| Blanco Mesaverde Field | 1,752.1 |
| Miscellaneous Fields | 4.6 |
| | 3,206.6 |
| TOTAL — | 9,256.4 |

---

TAB 6

---

## COMPARISON OF REMAINING RESERVES, PERCENTAGES AND RESERVE LIFE INDEXES FOR DIVESTED COMPANY AND EL PASO

(Gas Volumes at 14.73 psia and 60° F.)

| | PNW or Divested Company | EPNG | Total |
|---|---:|---:|---:|
| **January 1, 1957** | | | |
| San Juan Reserves, bcf | 2,591 | 9,539 | 12,130 |
| Per Cent | 21.4 | 78.6 | 100.0 |
| Total System Reserves, bcf | 6,054 | 27,281 | 33,335 |
| Per Cent | 18.2 | 81.8 | 100.0 |
| 1956 Production, bcf | — | 856 | |
| Reserve Life Index, Years | — | 31.9 | |
| **January 1, 1967** | | | |
| San Juan Reserves, bcf | 3,207 | 11,509 | 14,716 |
| Per Cent | 21.8 | 78.2 | 100.0 |
| Total System Reserves, bcf | 9,256 | 30,165 | 39,421 |
| Per Cent | 23.5 | 76.5 | 100.0 |
| 1966 Requirement, bcf | 343 | 1,268 | |
| Reserve Life Index, Years | 27.0 | 23.8 | |
| Deliverability Life, Years | 12 | 10 | |

A detailed description of the reserve acreage and gas supply data is set forth in El Paso Exhibits 23 and 24.

The primary controversy regarding the division of the gas reserves relates to the validity of El Paso's estimate of the reserves proposed to be divested to New Company in the Big Piney fields (principally Frontier-Muddy) and in the Blanco-Mesaverde, Basin Pictured Cliffs, and Basin Dakota fields of the San Juan Basin. It is to this controversy that the Court's Findings of Fact are first directed.

The reserves in the Big Piney field and the San Juan Basin consist of both developed and undeveloped reserves, and there is no way of being absolutely certain of how much gas can be produced and recovered from these various fields in advance of the time that the gas is actually produced in its entirety. However, the gas industry recognizes certain methods and techniques by which estimates are made which are used by industry and regulatory commissions such as the Federal Power Commission.

Two basic methods are recognized. One is the performance method, often referred to as pressure performance or the pressure decline method. In order to use the performance method, it is necessary to have pressure data and cumulative gas production records over a period of time from a substantial number of wells. Having this information, reservoir engineers can make an estimate of the recoverable gas in a particular gas reservoir.

The other method is known as the volumetric or pore volume method. This method is designed to calculate the porous space within a gas reservoir which contains recoverable gas. By the drilling of wells, analysis of the cores, use of electric logs and other techniques, the thickness, porosity, water content, gas pressure, temperature, and production limits of the formation are determined and with this information and by the use of recognized techniques, the amount of recoverable reserves is computed.

The volumetric method of estimating gas reserves is used when there is not sufficient performance data to justify the use of the performance method, but there is a sharp difference of opinion among the experts as to the number of years of performance data required to justify the use of the performance method in preference to the volumetric method.

In this case, the reserve experts who testified used one or both of these methods as well as their own refinements or modifications of the performance method. It is clear from the evidence that whatever the method or methods used by the experts who testified, the judgment of the expert plays an important part in the appraisal of the available data and in arriving at an estimate of recoverable gas reserves.

In addition to El Paso, Aspen, Colonial, Colorado Interstate, Pacific Western, Rosenblatt-Husky, and Western States made estimates of the gas reserves in the Frontier-Muddy in the Big Piney and the Mesaverde, Pictured Cliffs, and Basin Dakota fields in the San Juan Basin. The experts who made these estimates testified concerning them and the methods by which they arrived at their estimates.

The estimates of the various experts are at variance not only with El Paso's estimate, but also with each other, and the Court can discern no thread of consistency by which the Court can reconcile these variations.

To illustrate the size and nature of the variations, there is set forth the reserve estimates of El Paso, Aspen, Colonial, Colorado Interstate, Pacific Western, Rosenblatt-Husky, and Western States in the San Juan Basin and the Frontier-Muddy of the Big Piney.

| | E. P. Exh. 23 | Aspen Exh. 6 | Colonial Exh. 24 | C. I. G. Exh. 10 | Pacific Western Exh. 21 | Rosenblatt-Husky Exh. 4–Tab 13 | Western States Exh. 14 |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | Gruy | Sipes, Bailey & Williamson | Van Horn | Harlan | | Culver |
| MESA VERDE | 1,752.1 | 1,162.4 | 1,554.1 | 1,664.5 | 1,246.8 | 1,400.0 | 1,777.6 |
| PICTURED CLIFFS | 396.2 | 311.9 | 344.9 | 396.2 | 170.4 | 396.0 | 496.9 |
| BASIN DAKOTA | 1,053.7 | 1,001.3 | 497.0 | 737.6 | 606.7 | 951.0 | 895. |
| FRONTIER-MUDDY | 2,133.2 | 405.3 | 1,897.7 | 1,399.6 | 1,403.9 | 1,726.0 | 2,153.2 |
| TOTAL DIVESTITURE | 9,256.4 | 6,752.5 | 8,184.9 | 8,099.1 | 7,329.0 | 8,374.2 | 9,222. |

To add to this disparity, Mr. Grandall, testifying on behalf of Paradox, stated that El Paso had underestimated rather than overestimated the Pictured Cliffs and Mesaverde reserves by 38 percent. This estimate was used by Paradox to substantiate its contention that at the time of the stock acquisition on January 1, 1957, PNW had 28.6 percent of the San Juan reserves rather than 21.4 percent asserted by El Paso.

The producing formations in the Frontier-Muddy and the San Juan Basin are "tight" formations, and the percentage of gas recovery and the rate of recovery is considerably less than in more porous formations. These factors complicate the estimate of reserves and have resulted in overestimates of reserves computed by use of the volumetric method. For example, El Paso's estimates by the volumetric method of the reserves of the Mesaverde and Pictured Cliffs formation at the time of the stock acquisition were later reduced by 30 to 40 percent after sufficient performance data had been obtained to use the performance method of estimation.

The Court finds that El Paso reserve studies and the data upon which the studies are based was assembled over many years of operation and is the same data used by El Paso in estimating reserves in the ordinary course of its business and in proceedings before the Federal Power Commission. The data upon which the estimate was made and the methods of evaluation have been consistently applied by El Paso in estimating both the reserves to be divested and those to be retained. Nevertheless, the Court finds that with present methods of production, the reserves proposed to be divested in the Frontier-Muddy of the Big Piney and in the San Juan Basin will not produce recoverable gas in the quantities estimated. The greater part of the deficiency is in the estimate of the Basin Dakota reserves and results from El Paso's use of the volumetric method. The Basin Dakota was developed in recent years and its performance data is accordingly limited. The use of

the volumetric method cannot be said to be unjustified; but if the Basin Dakota reserves proposed to be divested are overestimated, then also the Basin Dakota reserves retained by El Paso are overestimated in the same proportion, for the same data and the same methods were used in estimating both.

The principal variance in the reserve estimates in the Mesaverde and Pictured Cliffs fields relates to the undeveloped reserves; but the magnitude of the difference between most of the experts is not sufficient to affect the application of either of the Cascade guidelines relating to reserves.

Because of the lack of sufficient performance data in the Frontier-Muddy, El Paso used a combination of the performance and volumetric methods to make the reserve estimates, and it may be that these reserves are overestimated because of insufficient performance data. However, these reserves were obtained from PNW as a result of the merger. If El Paso's estimate is high, it means that the field has always contained less reserves than previously estimated; and to that extent, PNW had a smaller percentage of the total reserves of the two systems at the time of the merger. In other words, if the Frontier-Muddy reserves have been overestimated, it would reduce El Paso's estimate of the total reserves, but it would not change the percentage relationship between what El Paso acquired in the Big Piney by virtue of the merger and what it is divesting.

Although it is not possible to ascertain with accuracy the total recoverable gas in the reserves which El Paso proposes to divest to New Company, the Court can determine from the evidence whether or not El Paso's proposal meets the Cascade tests which are here repeated:

(a) The reserves granted New Company must be no less in relation to present existing reserves than PNW had when it was independent; and,

(b) the new reserves developed since the merger must be equitably

divided between El Paso and new company.

Assuming that each estimate of the reserves which El Paso proposes to divest is accurate, if the Basin Dakota reserves retained by El Paso are reduced by the same proportion as the expert witnesses reduced New Company's Basin Dakota reserves, but the retained Pictured Cliffs and Mesaverde reserves are not reduced, New Company will receive a greater proportion of the total system reserves than PNW had on January 1, 1957, and as great or a greater proportion of the San Juan reserves than PNW had on January 1, 1957, with two minor exceptions. (See El Paso Exhibit 108.) Colonial's estimate of PNW's share of the San Juan reserves on January 1, 1957, is 20.4 percent versus 20.1 percent on January 1, 1967, and Pacific Western's estimate is 17.2 percent on January 1, 1957, versus 16.9 percent on January 1, 1967. A summary of this portion of El Paso Exhibit 108 is set forth in tabulated form on the following page.

| 1-1-57 | New Company | Aspen | Colonial | CIG | PW | R-H | WS |
|---|---|---|---|---|---|---|---|
| San Juan (%) | 21.4 | 17.2 | 20.4 | 21.2 | 17.2 | 19.3 | 22.0 |
| Total System (%) | 18.2 | 14.7 | 17.5 | 17.3 | 15.8 | 16.6 | 18.4 |
| 1-1-67 | | | | | | | |
| San Juan (%) | 21.8 | 18.0 | 20.1 | 21.3 | 16.9 | 19.8 | 22.4 |
| Total System (%) | 23.5 | 18.4 | 22.5 | 21.8 | 20.4 | 21.7 | 23.7 |

The Court finds that the gas reserves proposed to be divested to New Company by El Paso are no less in relation to present existing reserves than PNW had when it was independent, and that El Paso's proposal satisfies that guideline of Cascade.

We now consider the second requirement of Cascade, that there be an equitable division of the reserves developed since the merger.

The reserves developed since the stock acquisition are set forth in El Paso Exhibit 61(d) on an annual basis together with the annual production from the total reserves. On the basis of El Paso's reserve estimates, New Company will receive over 50% of the net additions to the reserves (new reserves minus production) developed since the stock acquisition. Essentially the same result is reached if the other reserve estimates in evidence are used and adjusted for a reduction of El Paso's *retained* Basin Dakota reserves in the same proportion as the reserve estimates reduced El Paso's estimates of the Basin Dakota reserves to be *divested*. (El Paso Exhibit 108.) Using the reserve estimates of Aspen, et al., so adjusted, New Company will receive from 45 percent (Aspen) to 60 percent (Colonial) of the net additions to the reserves since the stock acquisition. If a computation were made as of the date of the merger, the proportion of the net addition to reserves divested to New Company would probably be higher.

If an equitable division of the reserves developed after the merger or the stock acquisition is to be measured by the division of net additions to reserves, El Paso's proposal would be fair and equitable. Although the net addition to reserves divested and retained is a factor for the Court's consideration, the Court finds that it is neither the sole nor principal criteria for an equitable division.

If the division of the reserves is to be measured by the requirements of New Company to serve the northwest division and to supply a project by which New Company would compete in the

California market, the Court finds, and it is admitted by most of the parties in interest if not all of them, that the present total system reserves by any estimate in evidence are not sufficient to meet those requirements of New Company and the requirements of the southern division. To divest to New Company reserves to meet the above requirements would necessarily require the invasion of reserves which are dedicated to the service of the southern division. So also would a reserve guarantee by El Paso of 9.2 TCF invade reserves dedicated to the service of the southern division, if El Paso's reserve estimates are too high.

The Court finds that such an invasion would not be equitable and particularly so since the invasion of reserves dedicated to the service of the southern division is not necessary to place New Company in a position where it can compete in the California market.

For New Company and El Paso to be competitors for future increments to the California market will require that both seek new reserves. The evidence discloses two areas of promise available to New Company—Canada and the Rocky Mountain area. West Coast Transmission Company has indicated its willingness to supply 400,000 MCF per day to New Company. (El Paso Exhibit 44.) There is evidence of gas availability to New Company in gas fields in the Rocky Mountain area if a market is established.

The government-industry experiments with the use of nuclear energy to increase gas recovery from tight formations by explosions in the well bore (gas buggy) offers at least some hope of increasing the recoverable gas in the domestic reserves to be divested to New Company and retained by El Paso.

The Court is satisfied that capable management of New Company can obtain the reserves necessary to compete in the California market without invading the reserves dedicated to the service of the southern division.

Although total reserves are important, one of the best and most important measures of an adequate gas supply is the length of time it will deliver into the pipeline the full requirements of the system. This is known in the industry as "deliverability life". El Paso estimates that under its proposed divestment of gas reserves, that New Company will have a 12-year deliverability life and that the reserves retained by El Paso will give it a 10-year deliverability life.

Aspen's estimates show a deliverability life of five years for New Company. (Aspen's Exhibits 7 and 8) but Mr. Gruy, Aspen's expert, testified the deficiencies are not great for the first ten years, and that overall El Paso's proposal was fair and equitable.

Colonial's Exhibit 25 shows an 11-year deliverability life.

Colorado Interstate's Exhibit 11 shows a deliverability life of three years, but the deficiencies are small until the year 1974. Colorado Interstate's Exhibit 12 shows an annual availability or deliverability life for New Company of ten years with Colorado Interstate's proposed modification of the Sumas Exchange Agreement.

Pacific Western's Exhibit 21, page 2, shows New Company's deliverability life as ten years.

Rosenblatt-Husky's Exhibit 4, Tab 14, shows for all practical purposes, a deliverability life of seven years for New Company.

Western States' Exhibit 14, page 2, estimates New Company's deliverability life as eleven years.

Although this evidence is to some extent conflicting, the Court finds that under El Paso's proposal, New Company will have a deliverability life of at least ten years from January 1, 1967; that its deliverability life will at least equal El Paso's deliverability life after divestiture; that New Company's deliverability life of ten years is equal to the national average pipeline deliverability; that under El Paso's proposal, New Company will have a reserve life index of not less

than 20 years nor more than 27 years; that this is in excess of the national average which is 16 years and will be at least equal to El Paso's reserve life index upon divestiture.

Under the El Paso plan, El Paso proposes the reinstatement of the Sumas Exchange Agreement, which would require New Company to sell to El Paso from its San Juan Basin reserves, 100,000 MCF per day. Although New Company would be reimbursed by El Paso at the rate of $.25 per MCF, nevertheless, the effect of the reinstatement of the Sumas Exchange Agreement will be that New Company will not be able to utilize 100,000 MCF per day of the reserves divested to it either in the service of the northwest division or as a nucleus of a supply to compete in the California market.

■ The Court finds that the division of the gas reserves as proposed by El Paso is fair and equitable if the divestiture is freed from obligation to continue to supply gas to El Paso under the Sumas Exchange Agreement. However, since this 100,000 MCF per day constitutes a part of the reserves supplying the southern division, it would be inequitable to deprive El Paso of that gas without reasonable notice. The Court determines that a period of one year is a reasonable time for El Paso to replace the Sumas Exchange Agreement gas with other reserves and that El Paso after June 30, 1969, shall be entitled to no gas supplies by virtue of the Sumas Exchange Agreement.

We have not overlooked the Government's suggestion that not only should the Sumas Exchange Agreement not be reinstated, but that El Paso should divest an additional 100,000 MCF per day from El Paso's reserves in the San Juan Basin or the Permian Basin. The Government recognizes that this proposal would divert to the New Company, gas reserves presently dedicated to the southern division. The Government, however, justifies this invasion of the southern division reserves on the ground that El Paso could replace these reserves in the Permian Basin without paying a higher price, and also because El Paso has demonstrated an ability to acquire large quantities of reserves within short periods of time when necessary. The Court has carefully considered the Government's suggestion, but does not accept it for the principal reason that it would be inequitable to invade reserves which are dedicated to the service of the southern division, in view of the Court's finding that the management selected by the Court for New Company is capable of obtaining for itself gas reserves to support its competition in the California market.

### CASCADE GUIDELINES AND QUESTIONS FOR DETERMINATION

Any plan of divestiture necessarily requires a determination of:

1. What is to be divested;
2. To whom it is to be divested;
3. How it is to be divested.

These determinations must result in a New Company being at once restored to a position where it can compete with El Paso in the California market.

The Cascade guidelines in making these determinations are:

"(1) Gas Reserves."

"The gas reserves granted to New Company must be no less in relation to present existing reserves than Pacific Northwest had when it was independent; and the new gas reserves developed since the merger must be equitably divided between El Paso and the New Company.

"(2) Financial Aspects."

a. "Consider the disposition of the West Coast Transmission stock in the light of the New Company's need for working capital necessary to restore the competitive balance that the merger destroyed.

b. "Consider reimbursement of New Company by El Paso for the use by El Paso of the tax losses of Pacific Northwest.

"(3) Control of El Paso."

"To insulate New Company from El Paso, control, the plan should:

a. Ensure swift severance of the illegal combination and make sure New Company stock does not end up controlled by El Paso interests.

b. Require disposition of all of the stock of New Company held by El Paso with all convenient speed.

c. Impose conditions to make sure that El Paso interests do not acquire a controlling interest in New Company.

d. Consider the prospects of an outright purchase of the assets of New Company or its stock by outside interests as a means to accomplish insulation of New Company from control by El Paso interests."

■ A plan which will comply with the foregoing requirements and which will best accomplish the objective sought, must of necessity be tailored to some extent to fit the successful applicant.

For reasons which will later appear, the Court has selected Colorado Interstate Gas Company (CIG) as the successful applicant, and the plan adopted is one which in the Court's opinion is best suited to enable that successful applicant to accomplish the objectives sought by the divestiture. This plan may not be suitable for other applicants.

If, for any reason, final divestiture should not be made to CIG, a different plan may be adopted. For that and other reasons, the Court retains jurisdiction to alter, amend, modify, and supplement the plan and these findings and conclusions until a final decree of divestiture is entered.

Where findings of fact and explanatory material will interrupt the continuity of the discussion of the plan and the reasons for its adoption, they are contained in an APPENDIX which is attached and made a part hereof by reference.

## DISPOSITION OF WEST COAST AND NORTHWEST PRODUCTION COMPANY STOCK

(See APPENDIX for background and detail.)

Cascade states:

"It is also earnestly argued that the New Company will sorely need the valuable and fairly liquid stock of West Coast Transmission if it is to have the working capital necessary to restore the competitive balance that the merger destroyed."

The Court finds that some of the applicants would need either the stock of the West Coast Transmission Company or the funds derived from its sale divested to New Company in order that New Company may have the working capital necessary to restore the competitive balance that the merger destroyed.

However, the Court finds that the successful applicant selected by the Court does not need nor does it want the West Coast Transmission stock or the funds derived from its sale, and that it is ready, willing, and able to supply all working capital required to restore the competitive balance.

■ Both West Coast and Northwest Production supply gas to the Northwest division and for this reason, if for no other, divestment by El Paso should be required. Since the stock of these companies is a non-utility asset and does not form a part of the rate base, there is no compelling reason that New Company acquire it.

In the event of the final certification of the successful applicant, these stocks should be divested by El Paso by sale to persons satisfactory to the Court and the sale accomplished as soon as practical after final certification.

### TAX LOSS CARRY-FORWARD

Cascade states:

"It is also pointed out that some $53,-000,000 of taxable losses which Pacific Northwest had were utilized by El Paso during the years following the ill-starred merger. It is argued that

since these tax loss carry overs were in a real sense an asset of Pacific Northwest utilized by El Paso, the New Company should receive other assets or a reduction in debt of equivalent value. These allegations, if proven, require renumeration of some kind to the New Company; for it must be a viable healthy unit, as able to compete as Pacific Northwest was when it was acquired by El Paso."

The facts concerning the utilization of the tax losses of Pacific Northwest, for the most part, are not in dispute.

Prior to the merger on December 31, 1959, Pacific Northwest had failed to generate earnings and had accumulated tax losses of $23,000,000 of which $9,000,000 was generated in 1955. The tax losses generated in any year could be carried forward for five years, but if not utilized within the five-year period, were lost.

In 1959, PNW generated additional tax losses in excess of $3,000,000, and it appeared the $9,000,000 of tax loss for the year 1955 was about to be lost. By virtue of the merger on December 31, 1959, the merged companies were able to utilize the $9,000,000 tax loss which otherwise could not have been utilized.

The tax losses generated by Pacific Northwest for the years 1955 to 1959 were approximately $53,000,000, a part of which was due to the taking of accelerated depreciation. These tax losses were of no value to Pacific Northwest during those years because it had no taxable earnings to which these previous losses could be applied, although it is possible that PNW would have generated some income in later years whereby some portion of the loss could have been used before the five-year limitation expired.

The tax loss was of value to El Paso because it was in a position to generate taxable earnings against which the losses could be applied and its taxes reduced. By utilizing the tax losses, El Paso's cash flow was increased and thereby El Paso was able to and did maintain lower rates in the northwest division than otherwise would have been possible. The

lower rates resulted in an increased load which was necessary to change the northwest division from a loss to a profitable operation. Although the tax savings were at least in great measure flowed through to the customer in the northwest division by these low rates, El Paso also benefited by the conversion of the northwest division from a loss to a profit operation.

The tax savings realized by use of accelerated depreciation was the subject of a show cause order and a proceeding before the Federal Power Commission in 1966. It was disposed of on an informal basis with the agreement of the customers in the northwest division and resulted in placing in a reserve account, the sum of $19,945,000 (Tab 1 of El Paso Exhibit 1) which is amortized over a 13-year period at the rate of $7\frac{1}{2}$ percent a year and charged to income. This has the effect of reducing rates in the northwest division by the amount of the annual amortization. This reserve account is an obligation which will presumably be taken into account in fixing the amount of reimbursement El Paso will receive. Similarly, if El Paso should be required to reimburse New Company for the use of the tax losses, this would increase the value of New Company assets to be paid for by the successful applicant. The successful applicant does not need any such reimbursement for working capital or other purposes and does not wish any reimbursement be made. The Court finds that renumeration by El Paso is not required to make New Company a strong, viable, and healthy company, and that reimbursement would not materially add to New Company's ability to compete in the California market.

### MOBIL NOTES

At the time of the merger, there was in existence between PNW and Mobil, a contract relating to the development of the Piceance Creek field. Upon the merger, El Paso assumed the obligations of PNW under this contract and now proposes to divest the contract to New Com-

pany, subject to the remaining obligations thereunder.

In essence, the contract required PNW to advance 90 percent of Mobil's cost of drilling the wells in return for which PNW obtained the gas produced at less than the prevailing price.

The remaining amount due Mobil is approximately $500,000 but the quantity of gas which is still deliverable at the reduced rate would result in a savings of over $1,000,000.

■ The Court finds that this contract will be beneficial to the New Company, and that this contract should be divested to New Company and New Company should assume the obligations of the contract remaining at the time the divestiture is made.

## INTER-COMPANY AND MISCELLANEOUS CONTRACTS

The testimony refers to various agreements, which are summarized below with the Court's determination of their disposition.

## SUMAS EXCHANGE AGREEMENT

(See APPENDIX for the details of its negotiation.)

This agreement was entered into between PNW and El Paso August 23, 1955. The effect of the agreement is that El Paso agreed to purchase 100,000 MCF per day from PNW in the San Juan Basin for $.25 per MCF for a period of twenty years.

El Paso proposes to reinstate the agreement. The Court, in dealing with the division of gas reserves, has determined it should be reinstated, but should terminate on June 30, 1969.

If New Company at that time (June 30, 1969) is in control of the properties to be divested under a certificate of authority issued by the Federal Power Commission, any additional use by El Paso of New Company-San Juan reserves shall be subject to Federal Power Commission regulation.

If at that time, (June 30, 1969) New Company is not in control of the properties to be divested pursuant to such a certificate, El Paso and CIG and/or New Company may enter into an agreement permitting El Paso to continue to use not to exceed 100,000 MCF per day of New Company-San Juan reserves, provided that any such agreement shall require El Paso to return to New Company, an equivalent amount of gas; and provided further that when New Company assumes control of the divested properties pursuant to a certificate issued by the Federal Power Commission, any further use of gas from the San Juan reserves of New Company by El Paso shall be subject to Federal Power Commission regulation.

## COLORADO INTERSTATE, PACIFIC NORTHWEST, & EL PASO CONTRACT

Pacific Northwest and Colorado Interstate had entered into a contract providing that beginning in the fall of 1956, Pacific Northwest would sell a certain quantity of gas to Colorado Interstate for delivery near Rock Springs, Wyoming, for Colorado Interstate's line which was then under construction and which would meet Pacific Northwest's line. Colorado Interstate was unable to complete its line to that point, and consequently Pacific Northwest was unable to make delivery and CIG was unable to receive the gas. CIG intended to raise the defense of force majeure. This contract was Pacific Northwest's largest sale and was important to its economic health.

As a result, Pacific Northwest, Colorado Interstate, and El Paso entered into an agreement providing:

1. Colorado Interstate would pay to Pacific Northwest the full price for the gas it contracted to purchase; but Colorado Interstate would take delivery of the gas from Pacific Northwest at Ignacio, Colorado, in the San Juan Basin.

2. El Paso agreed to buy this gas from CIG, taking delivery from CIG at Ignacio.

3. Colorado Interstate agreed that at a time in the future, it would buy back from El Paso, the gas El Paso had purchased from CIG, deliver the gas to Cig at El Paso's Station 6 near Rock Springs, Wyoming. Pacific Northwest agreed to transport the gas from the San Juan Basin to that delivery point free of charge because Pacific Northwest had already been paid by Colorado Interstate for the cost of transportation.

Since the merger of El Paso and Pacific Northwest, Colorado Interstate has bought back all but 6 BCF of gas with El Paso making the delivery at Colorado Interstate's Station 6 without transportation charge.

■ Subject to the approval of the Federal Power Commission, this contract should continue in force and effect until completed, and New Company should assume El Paso's obligations to deliver the gas to CIG without charge for transportation.

### 100-100-100-60-40 CONTRACT

Reference has been made in the testimony to this contract. This was an agreement dated August 2, 1956, entered into between PNW and El Paso. It resulted from the fact that PNW did not have adequate gas supplies and was not in a position to raise sufficient funds to drill the wells on its San Juan acreage which were necessary to give PNW the needed supplies. El Paso agreed that it would sell to PNW, 100,000 MCF per day for three years, 60,000 MCF per day during the fourth year, and 40,000 MCF per day for the fifth year. The gas was to be delivered to PNW in the San Juan Basin. Two years after the above deliveries were completed PNW was to begin to sell the same quantity of gas back to El Paso.

Fifty-six BCF of gas was delivered to PNW under this contract prior to the merger. After the merger, there were no further deliveries made under this contract.

■ The Court finds no reason to reinstate this agreement.

### KINGSGATE EXCHANGE

On May 25, 1957, El Paso concluded negotiations on behalf of PNW which was then El Paso's wholly-owned subsidiary, with West Coast Transmission Company for 150,000 MCF of gas per day to be delivered at the international boundary at Kingsgate, British Columbia. Both the Federal Power Commission and the Canadian National Energy Board expressed concern that PNW would be unable to take that volume into its system in view of its market requirements. To provide assurance that its subsidiary would be able to meet its contracts, El Paso offered to enter into a contract with PNW to take such volumes of the gas imported at Kingsgate as PNW might find itself unable to digest. This agreement was never executed because PNW was merged into El Paso before the gas began to flow.

El Paso does not propose to enter into a similar agreement with New Company because New Company will need the full yearly volumes of gas it is entitled to import at Kingsgate to serve its expanded markets.

The Court finds the agreement was never consummated, and there is no reason for New Company to enter into such an agreement at this time.

### SAN JUAN GAS GATHERING AGREEMENT

Prior to the merger, PNW and El Paso had entered into a mutual gas gathering in the San Juan Basin under a contract which is in evidence as El Paso Exhibit 4. That contract covered only 126 wells producing gas from one formation in a limited area.

■ Whether or not New Company and El Paso should enter into a mutual gas gathering agreement is a matter for negotiation by the parties, subject to scrutiny and approval or disapproval by the Federal Power Commission.

## JACKSON PRAIRIE FIELD STORAGE PROJECT

This project is also known as the Chehalis Gas Storage Project.

This is a test storage project in which Washington Natural Gas Company, Washington Water Power Company, and El Paso each own one-third interest. The project is on leased land, a short distance from Seattle, Washington. It is a test project and differs somewhat from most gas storage projects in that the gas is being injected into a water-bearing sand or aquifer. It is estimated that it will have a total capacity of 20 BCF. The project is still under development and testing, and as of December 1, 1967, 5–2/10 BCF of gas has been stored. So far there is no evidence of leaking.

The project represents an investment to date of approximately $7,000,000 by the three companies.

El Paso proposes to divest to New Company its one-third interest in this project.

 The Court finds that it would be to the best interests of New Company that El Paso divest its one-third interest in this project to New Company, and that New Company assume El Paso's obligation in connection with the development and operation of the project as conceived by the three parties.

## TO WHOM ARE THE ASSETS TO BE DIVESTED

There are actually two questions to be determined. First, what is the identity of the New Company to which the divested assets will be transferred, and what applicant should be selected to acquire the management and control of that entity?

The Court finds that New Company may obtain tax advantages if the corporate entity to receive the divested assets is "Northwest Pipeline Corporation", a Delaware corporation which El Paso caused to be incorporated in 1965, and the Court finds nothing in the evidence which would indicate any reason why this corporate entity should not be utilized. However, we will continue to refer to that entity as "New Company".

The Court has already indicated its selection of the successful applicant and here sets forth its reasons for that selection.

The selection of the successful applicant involves the preliminary question of whether the Court should select the applicant which, in the Court's opinion, is best qualified to carry out the mandate that " * * * a new company be at once restored to a position where it could compete with El Paso in the California market", or (as El Paso contends) should the Court select all applicants which the Court finds are qualified to accomplish the objectives sought and instruct El Paso to negotiate " * * * a binding agreement * * * with each of the qualified applicants, and following presentation of the agreements to the Court, select the successful applicant." (page 41, El Paso Brief.) The successful applicant which the Court would select, in El Paso's view, would be the one offering the highest price.

 The Court finds, as do most of the intervenors, that all of the applicants are not equally qualified to make New Company a competitive factor in the California market. The Court also finds that of those applicants who are so qualified, all do not have the capability of furnishing the same degree of competition. The Court conceives its duty to be to select not only an applicant qualified to make New Company a competitive factor, but the applicant which in the Court's opinion can and will furnish through New Company, the greatest degree of competition and the greatest impact on the California market.

To select less than the strongest and best qualified applicant, gives to El Paso an unwarranted advantage in the competitive race for the California market, and particularly so when in the Court's opinion, New Company will be confronted with a much more formidable task in becoming such a competitive fac-

tor than was PNW for reasons which follow.

### COMPETITION 1967 vs. 1957

In 1957, the only California market for an out-of-state gas supplier were the natural gas distributors in California consisting of Pacific Gas and Electric Company in the north and the southern companies in the south, together with Edison and perhaps some other large gas consumers. In 1967, the market for the out-of-state supplier remains the same. In other words, although the consumption of gas in the state of California has expanded at a rapid rate since 1957 and still continues to expand, the possible purchasers from out-of-state suppliers has not expanded in numbers and the competition to supply this limited number of purchasers is more intense.

In 1957, El Paso was the only out-of-state supplier of gas to the California market. In 1967, there were three interstate pipelines supplying out-of-state gas to the California market: El Paso and Transwestern (recently acquired by Texas Eastern) serving the southern California distributers and Pacific Gas and Transmission Company, controlled by PG & E, which transports Canadian gas to California to supply the needs of PG & E. Consequently, New Company will be faced with two entrenched competitors in the south instead of one and confronted with the fact that the principal market in the north, PG & E, has its own out-of-state supplier in PG & T.

That El Paso is a stronger competitor today than in 1957 is indicated by the growth of its gross revenues from gas sales from $198,000,000 in 1957 to an estimated $370,000,000 in 1968, and an increase in its gross utility plant since 1956 of over $700,000,000. (El Paso Exhibit 111.)

New Company's other competitor in the south, Transwestern and its parent, Texas Eastern, for the year 1966 ranked first in the nation in terms of total gas sales revenues which were in excess of $390,000,000.

In comparison to its competition, New Company's 1968 gross revenues from gas sales are estimated at $118,800,000. (El Paso Exhibit 1, Tab 10.)

Although this competition is formidable, the evidence indicates that it is not impregnable. The southern companies state that their incremental market requirements are sufficient to support a pipeline to California by 1970, and they welcome competition. Edison is seeking an out-of-state supplier.

Although the expanding California market appears to offer opportunities for New Company to enter the market, the recommendation of the Federal Power Commission staff that a 42-inch pipeline should be constructed to California is a matter of grave concern, for according to the evidence before the Court, a 42-inch line would serve all increments to the southern California market for the foreseeable future. The Supreme Court recognized that competition in the California market is limited to future increments, which have not yet been certified for service. Once an increment has been certified, it is withdrawn from competition. The recommendations of the Commission's staff for the construction of a 42-inch line have been commended by the FPC examiner in a current proceeding as "bold and constructive". The Government in its Brief at page 9 states:

> "It is clear that the 42-inch concept is gaining ground; it has already been accorded a respectful reception in the FPC's Order of March 5, 1968. (California-Edison Motion, page 4.)"

The Government at the same page of its Brief also states:

> "It is too early to predict the ultimate direction or final outcome of this current FPC proceeding. The opportunity it presents to the new company which is to emerge from this law suit is evident. If a full scale 42-inch proceeding gets underway, either in this current FPC case or in some later one, the new company should be equipped to enter as a contender with

at least the minimum qualifications for serious consideration."

The Court agrees and adds that for New Company to be a serious competitor for a prize of that magnitude will require the most experienced management and the strongest financial backing which is available to it, and it is imperative that the strongest applicant and the one best qualified to make New Company a serious competitor in these circumstances be selected as the successful applicant.

## SELECTION OF THE SUCCESSFUL APPLICANT

■ The Court here sets forth its reasons for selecting CIG as the successful applicant.

CIG has been engaged in the operation of a natural gas transmission system along the eastern slope of the Rocky Mountains since 1928. Its system is presently physically connected with that of the New Company near Green River, Wyoming. Although other applicants for acquisition have in their organization men with experience in the natural gas transmission business, none of the applicants with the exception of Paradox, have had any history of operations in this field, and Paradox is not so engaged at the present time.

CIG is the only applicant which has a presently functioning organization with experienced management and personnel which gives it the capability to restore New Company to a competitive position in a much shorter period of time than could be done by any other applicant. Because of the present competitive situation, time is of the essence.

It has had a wealth of experience in proceedings before the Federal Power Commission; it is financially able to supply all working capital needed by New Company, and its financial strength will assure the financial ability of New Company to finance an invasion of the California market if and when so authorized by the Federal Power Commission.

It has demonstrated its ability to acquire reserves for its own system in the past, which indicates its present ability to acquire for New Company, reserves to meet the expanding requirements of the northwest and to compete in the California market.

By its acquisition of all of the common stock of New Company, CIG has perhaps a greater incentive to expand to California than those applicants who would acquire a lesser interest, for it has more to gain if it is successful in gaining a foothold in this rapidly expanding market.

Edison would disqualify CIG from consideration because Edison did not interpret CIG's testimony and Brief as evidencing a clear policy to offer service to Edison on the same nondiscriminatory basis as CIG might be willing to offer service to other buyers in California. It is Edison's position that no applicant may acquire these assets who would exclude Edison (or any other significant California buyer desiring service) from competitive access to any service offered in the California market, for such exclusionary practice or policy might tend to substantially lessen competition or foster an illegal monopoly in contravention of the very laws now sought to be enforced.

We have again read and considered the testimony of the CIG witnesses referred to by Edison at page 64 of its Brief filed herein on April 17, 1968, and find therein no statement of policy or position or intent to exclude Edison from consideration for service by a direct sale. The witnesses did not commit CIG to serve Edison directly, but also, they did not rule out the possibility of a direct sale. A direct sale to Edison is only one way to enter the California market and it would be a mistake, if not improper, for this Court to dictate how New Company should or should not attempt to compete.

## SHOULD CIG BE EXCLUDED FOR COMPETITIVE REASONS?

The Government has raised the questions of whether or not CIG is now a potential competitor for the California market and "to a lesser extent" a

potential competitor with New Company for Rocky Mountain reserves and for its existing customers in the Pacific Northwest.

The Government states at page 32 of its Brief:

"We do not think, however, that CIG should be automatically excluded from consideration here because it is now a potential competitor for the California market. If the combination of CIG and the New Company were to create a considerably stronger competitor for the California market than either one could possibly be alone, the Court could validly conclude that such a combination is pro-competitive rather than anti-competitive, and entirely consistent with the mandate of the Supreme Court."

The Government, in its Brief, discusses the pro's and con's of the question of whether or not CIG should be disqualified and concludes that it is a close question. The Court has given careful consideration to the evidence bearing upon these questions.

The facts to which the Government points indicating that CIG is *now* a potential competitor for the California market are:

1. Its geographical situation gives it an advantage over other major interstate pipelines, except the Pacific Northwest line with respect to the California market.

2. It is an established, experienced, conservatively financed company and would seem far better able than most companies successfully to finance a large-scale pipeline extension.

3. That CIG should be able to gain access to gas reserves needed for the California project.

Other evidence bearing on the determination of this question is the testimony of Mr. King and Mr. Pelican of CIG which is not controverted in any material respect.

This testimony is summarized in CIG's Brief at pages 68 to 85 and need not here be repeated in detail, but it shows that CIG's major markets are on the eastern slope of the Rocky Mountains, while New Company's markets are on the west side of the Continental Divide. Approximately 80 percent of CIG's gas supply is in the Anadarko Basin in Texas, Oklahoma, and Kansas, while New Company will derive its supplies principally from Canada, the San Juan Basin in New Mexico, and the Big Piney fields in Wyoming. Presently, there is no field from which both systems are taking gas.

In Wyoming, New Company obtains supplies from the Big Piney field which is about 75 miles from the nearest point on CIG's system, and CIG obtains about 5 percent of its supply from the Desert Springs field which is also 75 miles distant from the New Company's system.

In Colorado, New Company's supplies are located west of the Continental Divide and along the western and southwestern borders of Colorado, while CIG's supply areas in Colorado lie far to the east and access is barred by the Continental Divide.

As to CIG's possible competition for New Company markets, there is no evidence that CIG has shown any interest in the Pacific Northwest, or that CIG's geographical position or its standing in the industry has had any impact on the competitive situation in that area. The major growth of markets in the Pacific Northwest are along the western portion of the New Company's system and are far removed from CIG's present line. There is no evidence that the incremental demands in the Pacific Northwest area are sufficient in size to support an expansion by CIG into that area. It appears that the more likely competition in the Pacific Northwest area will come from Canadian gas transported by Pacific Gas Transmission Company, West Coast, or some other company utilizing Canadian gas.

Any potential of CIG as a competitor to New Company in the northwest, in the Court's opinion, is not of sufficient

magnitude to exclude CIG from consideration.

Referring now to the California market, in 1958, CIG had an excess supply of gas for which it desired to find a market. Among the attempts to dispose of it was a proposed joint venture with El Paso to take gas from the western terminus of CIG's line at Rock Springs, Wyoming, to a point on the California border. CIG was to provide 300,000 MCF per day of the 400,000 MCF needed to commence initial delivery. This has been referred to in the testimony as the Rock Springs project. The application for the project was denied by the Federal Power Commission.

Except for this one incident, there is no evidence of any attempt by CIG to become a competitor in the California market, and there is no evidence that CIG's financial strength and its geographical situation has had any impact upon or has been a factor in the competition for the California market.

 From the evidence before the Court, CIG is not and since the failure of the Rock Springs project has not been a competitor for the California market, and that acting alone, its potential for being a competitor in the California market in the foreseeable future is so uncertain that it should not be grounds for the exclusion of CIG from consideration.

The Court is satisfied that CIG, standing alone, has little chance of affecting competition for the California market; but the Court is equally convinced that of the alternatives available, the combination of CIG and the New Company will create the strongest competitive potential for the California market.

For the reasons stated under the heading, "Competition 1967 vs. 1957" (supra), the Court reiterates its conviction that to restore the competition required by the Supreme Court's mandate demands the strongest competition potential available.

### HOW THE PROPERTY IS TO BE DIVESTED

This part of the plan provides a method of divestment which, among other things, will accomplish the insulation of New Company and the successful applicant from El Paso control as required by Cascade.

The alternative methods or means of divestiture available to the Court are:

1. A cash sale;

2. A transfer of the divested assets to a New Company and a private or public cash sale of the stock of New Company; or,

3. A transfer of the assets in exchange for stock; or,

4. A combination of one or more of the foregoing.

Implicit in all of these alternatives is that the acquirer of the property will assume some portion of El Paso's bond and debenture indebtedness, and that the foregoing methods are the available means of disposing of the equity.

Although a sale of the assets to be divested for cash or a transfer of the assets to a New Company and the sale of all of the New Company common stock for cash would effectively accomplish the insulation of El Paso from control of the divested system, El Paso would suffer adverse tax consequences.

 The Court is of the opinion that the stock exchange plan proposed by CIG will also adequately and effectively insulate New Company and the successful applicant from El Paso control, is better suited to enable CIG to proceed promptly with the steps necessary to enable it to become a competitive factor in the California market, and may avoid adverse tax consequences to El Paso.

Again the Court recognizes that this plan may not be the one best suited to a different applicant, and if for any reason a different applicant should be selected, a different plan may be established.

### BASIS FOR REIMBURSEMENT

 The basis for reimbursement to El Paso should be the fair market value of the equity in the assets divested at the the time of divestment, determined by negotiation between the successful ap-

plicant and El Paso, and if they are unable to agree within the time alloted by the Court, the fair market value should be determined by the Court.

## HOW REIMBURSMENT WILL BE MADE

1. New Company will assume approximately $170,000,000 of El Paso's bond and debenture debt and assume the payment of the cost of the debt roll over of one-eighth of one percent increase in the interest rate. In satisfaction of this assumption, New Company will issue to holders of El Paso bonds and debentures, bonds and debentures of New Company of like tenor and effect, but with an interest rate one-eighth of one percent greater than the rate applicable to the securities of El Paso which will be surrendered and cancelled.

2. New Company will issue to El Paso, preferred stock (convertible into common stock of CIG) equivalent in amount to the fair market value of El Paso's equity. This stock may be retained by El Paso or disposed of by El Paso as it sees fit. The exact terms and conditions of the preferred stock and the provisions pertaining to conversion shall be negotiated by CIG and El Paso, and in case of failure to agree, such determinations shall be made by the Court.

3. New Company shall issue to CIG, all of the common stock of New Company in exchange for $5,000,000 in cash and common stock of CIG sufficient in value to satisfy the conversion requirements of New Company's preferred stock.

## PROVISIONS FOR INSULATION FROM EL PASO CONTROL

The final decree of divestiture shall contain restrictive provisions to insulate New Company from domination or control by El Paso, its directors, officers, and stockholders, either directly or indirectly.

The restrictive provisions shall be negotiated by El Paso and CIG and submitted to the Court for its consideration. If El Paso and CIG cannot agree, the Court will formulate the provisions.

## TIME OF DIVESTMENT

Final divestment shall be consummated as soon as possible after the issuance of a permanent certificate to New Company by the Federal Power Commission. In the interim period, New Company may assume control and management of the physical plant if so authorized by a temporary certificate issued by the Federal Power Commission.

CIG shall divest itself of any El Paso stock it may own or control prior to assuming control and management of the property.

## OPERATING EMPLOYEES IN THE NORTHWEST DIVISION

Those employees of El Paso who are employed in the operations of the northwest division at the time of divestment and who desire to continue their employment with the New Company should, generally speaking, be offered employment by New Company on no less favorable terms and with no less favorable benefits than their present employment provides. This is a statement of principle, and is not intended to vest in any individual employee a right to be employed by New Company. This statement of principle does not apply to those employees holding policymaking positions.

## CONCLUSION

The Court is satisfied that under this plan, New Company will be a strong viable company, capable of serving the Pacific Northwest and restoring the competition in the California market which was destroyed by El Paso's acquisition of the PNW stock and the later merger of the two companies.

## PROCEDURE TO IMPLEMENT PLAN

The implementation of this plan requires a step-by-step procedure. It is the Court's purpose to here point out the steps that should be taken and the Court will enter such orders as may be necessary from time to time to carry out

the procedures here set forth, or to amend, alter, or supplement these procedures as the facts and circumstances may require.

### First Step:

CIG and El Paso shall immediately submit the plan herein contained to the Internal Revenue Service for a ruling on whether or not the divestiture, according to this plan, is a tax-free transaction.

Concurrently, the successful applicant and El Paso shall enter into negotiations to:

a. Determine the amount of reimbursement El Paso shall receive for its equity in the properties to be divested; or, in the alternative, a formula by which the amount may be determined at the time of divestiture;

b. Determine the terms and conditions of the preferred stock and the conversion provisions thereof; or, in the alternative, a formula by which the terms and conditions of the preferred stock may be determined as of the date of divestment;

c. Formulate restrictive provisions to insulate New Company from domination or control by El Paso, its directors, officers, and stockholders, either directly or indirectly;

d. Agree upon such other matters as El Paso and the successful applicant may deem proper.

Any and all agreements which El Paso and the successful applicant may enter into shall not become effective unless and until they are approved by the Court.

The negotiations shall be concluded within 35 days after the entry of these Findings of Fact, Conclusions of Law, and Opinion.

The Department of Justice may, if it so desires, have an observer present at all negotiations between El Paso and CIG under Step 1; and for this purpose, the Department of Justice shall be advised of the time and place of all such negotiations.

### Step Two:

El Paso and CIG shall, as soon as possible, commence the preparations necessary to cause New Company to make application to the Federal Power Commission for the necessary certificate to authorize New Company to acquire and operate the divested property. To this end, El Paso shall take the necessary steps to place representatives of CIG in a position to utilize the Northwest Pipeline Company for this purpose and otherwise cooperate with CIG to the end that the applications for temporary or permanent certificates, or both, be presented to the Federal Power Commission with all possible expedition.

Insofar as possible, these preparations should proceed concurrently with the procedures under Step 1.

### Step Three:

At the conclusion of the negotiations under Step 1, El Paso and CIG shall report to the Court in writing, the result of these negotiations and the ruling of the Internal Revenue Service, if such a ruling has been made at the time. A copy of this report shall be served upon all parties in this proceeding entitled to service, including the applicants for acquisition.

If the negotiators have arrived at an agreement on reimbursement for El Paso's equity and the terms and conditions of New Company preferred stock, the Court will then enter an order setting a time within which all parties in interest may file objections to the Court's Findings of Fact, Conclusions of Law, and Opinion and the report of the negotiators and will set a time and place for hearing these objections.

If El Paso and the successful applicant have been unable to agree on the matters requiring agreement, the Court will set a time for hearing and determining the matters in controversy. At that time or some later time fixed by the Court, the Court will hear any objections of the parties in interest to the Court's Findings of Fact, Conclusions of Law, and Opinion

and the Court's determination of any controverted matters.

The principle purpose of detailing the procedure is to guide counsel and preserve the appeal rights of the parties. For this latter reason, the Court declares that these Findings of Fact, Conclusions of Law, and Opinion are tentative and interlocutory in character and will remain so until after the parties in interest have had an opportunity to object to the findings and determinations of the Court, be heard thereon, and their objections ruled upon by the Court.

CIG, having been selected as the successful applicant, is now a party to these proceedings and entitled to participate the same as any other party. The unsuccessful applicants have not been and are not now considered as parties to this proceeding, but retain their position as applicants for acquisition, and, as such, are entitled to be served with all documents as if they were parties.

The Court has purposely not provided for any procedures beyond the applications to the Federal Power Commission for certificates of authority to carry out the plan of divestiture. If further proceedings are required by this Court during the pendency of those proceedings or prior to final divestiture, the Court will establish procedures appropriate to the circumstances which require the Court's further action.

## APPENDIX

### PROCEEDINGS SINCE CASCADE

On April 18, 1967, the undersigned was assigned by the Honorable Alfred P. Murrah, Chief Judge of the Court of Appeals, Tenth Circuit, to the District of Utah to conduct the further proceedings required by Cascade.

On April 21, 1967, this Court entered an Order that a conference with counsel would be had in Salt Lake City, Utah, on June 9, 1967, to discuss procedure and a timetable to determine matters requiring resolution before proceeding with the "de novo" hearing ordered by the Supreme Court.

At the conference on June 9, the United States, El Paso, the Federal Power Commission as amicus curiae, 22 prospective intervenors, and 11 parties who were interested in acquiring the properties to be divested (referred to in these proceedings as applicants for acquisition) appeared and participated in the conference.

Following the conference, the Court vacated the previous Orders of Divestiture and ordered the following pre-hearing procedure:

1. All Motions to Intervene should be filed by June 26, 1967, and would be determined ex parte.

2. El Paso was required to file a plan or proposal for divestiture by August 4, 1967.

3. Applicants for acquisition were required to file their respective plans or proposals for acquisition by August 25, 1967.

4. The parties to these proceedings, including the intervenors, (but excluding applicants for acquisition) were given until September 18, 1967, to file comments upon the plans and proposals for divestiture.

The Court also ordered that the applicants for acquisition could appear at the hearings, produce evidence, and be heard in support of their respective plans and proposals for acquisition, and that applicants for acquisition would be subject to examination by any of the original or intervening parties on matters relating to their respective plans or proposals.

The Court granted 26 Motions to Intervene, denied all Motions to Intervene filed by applicants for acquisition, and ordered that the previous Order of the Court allowing the Federal Power Commission to appear amicus curiae should remain in force.

On September 6, 1967, the Court ordered the "de novo" hearings to commence at 10:00 a.m. on Monday, October 16,

1967, in the Federal District Court at Ogden, Utah. (The hearings were held at Ogden because the only Federal District Courtroom in Salt Lake City large enough to accommodate the large number of counsel was not available for these proceedings.)

By the same Order of September 6, 1967, the Court ordered a pre-hearing conference be held in Salt Lake City on September 28, 1967 (later changed to October 3):

1. To delineate the questions which would be the subject of the hearings and prescribe the order of their hearing and determination;

2. To determine the order of presentation of evidence and the time required for that purpose;

3. To discuss and determine any other questions of procedure.

At the conference on October 3, there was a tentative delineation of the issues and the adoption of rules of procedure.

The hearings were commenced at Ogden, Utah, on Monday, October 16, 1967.

Some intervenors failed to file Comments on the proposed plans and did not participate in the hearings.

Originally there were 12 applicants for acquisition. Two withdrew (Northwest Pipeline Corporation and Transcontinental Gas Pipeline Corporation) and Husky Oil Company joined forces with Rosenblatt, and they were thereafter referred to as Rosenblatt-Husky.

The remaining nine applicants for acquisition are:

Aspen Pipeline Company
Colonial Natural Gas Company
Colorado Interstate Gas Company
Continental Pacific Corporation
Great Lakes Carbon Corporation
Pacific Western Pipeline Corporation
Paradox Production Corporation
Rosenblatt-Husky
Western States Pipeline Corporation

The 22 intervenors who participated in the hearings are:

Arizona Corporation Commission
Arizona Public Service Company
Tucson Gas and Electric Company
State of California
Public Utilities Commission of California
Cascade Natural Gas Corporation
Public Utilities Commission of Colorado
Idaho Public Utilities Commission
Mountain Fuel Supply Company
Nevada Public Service Commission
Northwest Natural Gas Company
Oregon Public Utilities Commission
Pacific Gas and Electric Company
San Diego Gas and Electric Company
Southern California Edison Company
Southern California Gas Company
Southern Counties Gas Company of California
Southwest Gas Corporation
Utah Public Service Commission
Washington Natural Gas Company
Washington Water and Power Company
Washington Utilities & Transportation Commission

The de novo hearings were held in Ogden, Utah, from October 16, 1967, to November 15, 1967; were then recessed until January 8, 1968, at which time, by unanimous consent of the parties, the hearings were resumed in Denver, Colorado. The taking of evidence was concluded on March 21, 1968, and the following briefing schedule was ordered:

Applicants for Acquisition by April 1, 1968;

Intervenors and Federal Power Commission by April 16, 1968;

El Paso by May 1, 1968;

United States by May 10, 1968;
(Extended to May 15, 1968.)

El Paso Reply to the United States Brief by May 18, 1968;
(Extended to May 25, 1968.)

Oral argument was had on June 3, 1968.

## CANADIAN GAS SUPPLY

Sumas # 1, Sumas # 2, Kingsgate

The reserves available under these three contracts have been summarized in El Paso's Exhibit 42 and is here set forth.

## CANADIAN SUPPLY

### From Westcoast Transmission Company, Limited

| Contract Date | Term | Termination Date | Daily Volume M²cf | Reserve 1–1–67, M³cf |
|---|---|---|---|---|
| 1. December 11, 1954 (First Sumas), attached as Item 1. | 20 years | 1977 | 300 | 1,191.0 |
| 2. February 28, 1966 (Second Sumas), attached as Item 2; as Supplemented October 6, 1967, Supplement attached as Item 2S.[1] | 20 years | 1987 | 200 | 1,476.9 |
| 3. September 23, 1960 (Kingsgate), attached as Item 3. | 20 years | 1981 | 150 | 765.0 |
| | | | | 3,432.9 |

[1]. Note: The Second Sumas, dated February 28, 1966, was filed with the FPC in Docket CP66–315. This contract provided for the following volumes on a minimum 75% load factor:

 1. The First Sumas 300 M²cf/d was extended from 1977 through 1991.

 2. An additional 300 M²cf/d was provided for as follows:
 (a) 100 M²cf/d beginning 11–1–66
 (b) 100 M²cf/d beginning 11–1–67
 (c) 100 M²cf/d beginning 11–1–69

 3. El Paso was given an option to purchase still another 300 M²cf/d as follows:
 (a) 100 M²cf/d beginning 11–1–70
 (b) 100 M²cf/d beginning 11–1–71
 (c) 100 M²cf/d beginning 11–1–72

The Federal Power Commission in its opinion authorized only the importation of the 200 M²cf/d shown on lines 2a and 2b above (which is the alternate proposal described on page 6, footnote 9 of El Paso's Plan of Divestiture). This change was incorporated in the February 28, 1966 agreement by supplement dated October 6, 1967. This supplement provides for 200 M²cf/d at a minimum 90% load factor for a period of 20 years.

———◆———

Although the second Sumas Agreement provided for the delivery of 300,000 MCF per day and an option to El Paso to purchase still another 300,000 MCF per day, the Federal Power Commission has authorized the importation of only 200,000 MCF per day, and the Federal Power Commission required the execution of a new contract between El Paso and West Coast covering only this 200,000 MCF per day. However, Mr. McMann, Chairman of the Board of West Coast, has indicated that the remaining 400,000 MCF per day would still be available to either El Paso or New Company.

The Sumas gas is delivered to El Paso at the international boundary between British Columbia and the State of Washington near Sumas, Washington.

The Kingsgate gas is delivered by West Coast to Pacific Gas Transmission Company facilities at the Kingsgate import point on the international boundary between British Columbia and Idaho and PG & T delivers the gas to the Pacific Northwest system in Spokane County, Washington.

## WEST COAST STOCK AND SUMAS EXCHANGE AGREEMENT

The acquisition of the West Coast stock by PNW and the Sumas Exchange Agreement arose out of the same set of circumstances and the same negotiations and many of the Findings of Fact relate to both transactions.

West Coast Transmission Company and PNW were competitors in a hotly contested proceeding before the Federal Power Commission for a certificate to serve the Pacific Northwest. West Coast, which was a gathering and transmission company in the Ft. Nelson and Ft. St. John area in Canada, was seeking to serve the Pacific Northwest with Canadian gas while PNW was proposing to serve the same market with gas from the San Juan Basin.

Pacific Northwest prevailed. This left West Coast with a supply of gas and a plan, but no certificate and no prospect of serving the Pacific Northwest.

PNW was relying upon a supply of gas that it had obtained from Phillips and Pan American in the San Juan Basin, but which required that PNW drill the wells. This entailed a large outlay of money which PNW could not raise because West Coast had taken an appeal from the decision of the Federal Power Commission and in the face of this appeal, PNW was incapable of financing either its drilling or construction programs.

Because of this situation, between June of 1954 and December of the same year, negotiations were carried on between West Coast, PNW, and El Paso, seeking a solution.

Out of these negotiations, there grew a three-party agreement whereby West Coast agreed to build a pipeline to Sumas and there deliver to PNW 300,000 MCF of gas per day. This was more gas than PNW felt it could digest and yet that was the minimum amount which West Coast thought would make the pipeline economically feasible. Consequently, El Paso agreed that it would take 250,000 MCF of the 300,000 MCF and dispose of it in the California market. These efforts failed, so El Paso proposed that if PNW would take the 200,000 of the 300,-000 MCF, El Paso would take the other 100,000 MCF by purchasing from PNW, 100,000 MCF per day of PNW's San Juan gas at a total price of $.25 per MCF. This arrangement was ultimately approved by the Federal Power Commission and is commonly referred to as the Sumas Exchange Agreement.

Also as a part of this three-way agreement, West Coast agreed to withdraw its appeal from the Federal Power Commission's certification of PNW and that PNW should acquire 25 percent of the West Coast stock at a price of $5.00 per share.

After the acquisition of PNW by El Paso, there was no reason to keep the Sumas Exchange Agreement in operation, and it became inoperative.

### Acquisition of West Coast Stock by El Paso

PNW acquired 25 per cent (1,127,750 shares) of the West Coast stock in the spring of 1955 in the name of West Coast Investment Co., a wholly-owned subsidiary of Pacific Northwest.

When El Paso, on January 1, 1957, acquired control of PNW through the stock acquisition, it also acquired the stock of West Coast Investment Company and thereby the West Coast stock. In its prospectus issued by El Paso in connection

with the stock acquisition, (El Paso Exhibit 3) El Paso listed the West Coast stock as having a market value on January 2, 1957, of $29.00 per share. Presumably, that value of the West Coast stock was included in computing the value of El Paso stock to be exchanged for PNW stock, and the Court finds that El Paso in effect paid the equivalent of market value for that stock, although for tax purposes, the stock still retained its original cost of $5.00 per share.

After El Paso acquired stock control of PNW and before the merger, the first preferred dividend payment matured on PNW's preferred stock. PNW had no profits with which to pay the dividend. Since the dividend had to be paid out of profits, El Paso bought 220,000 shares of the West Coast stock from PNW at a price of $26.00 per share. Since PNW's book value of the stock was $5.00 per share, this created a profit from which PNW could legally pay its preferred dividends.

After the merger between El Paso and PNW, West Coast issued some additional stock, and the present percentage of the stock owned by El Paso is 18 percent of the total. Also after the merger, El Paso purchased from Pacific Petroleum Ltd., 29,375 shares at a total cost of $526,632.96 which was the market value of the stock.

The Court further finds that El Paso should divest itself of this stock because West Coast is one of the principal suppliers of gas to the New Company, and El Paso, by virtue of its stock ownership, could exercise some influence in the operations of West Coast.

## INVESTMENTS

### PHILLIPS PACIFIC CHEMICAL COMPANY

Phillips Pacific Chemical Company owns and operates a fertilizer plant near Hedges, Washington, and is a gas customer of the northwest division. El Paso owns 49 per cent of the stock of this company, and although its investment in this stock is only $200,000, El Paso's stock interest is now worth approximately $2,641,000. El Paso Exhibit 32 shows that the income of Phillips Pacific for the year 1957 was a net loss of $435,000 and the net income for the year 1966 was $1,306,000. El Paso proposes to divest this stock to New Company. The Court finds that the divestiture of this stock to New Company would be for its best interest.

### PACIFIC NORTHWEST REALTY CORPORATION

The Pacific Northwest Realty Company was a wholly-owned subsidiary of PNW, and upon the merger became a wholly-owned subsidiary of El Paso. This company owns a nine-story office building in Salt Lake City, which was formerly the headquarters of PNW. El Paso Exhibit 31 discloses the properties are under lease to El Paso for a term of 25 years ending in 1983. That exhibit also contains the financial statement of this company.

El Paso proposes to divest this company to New Company, and the Court finds that such divestiture is in the best interest of New Company.

### NORTHWEST PRODUCTION CORPORATION STOCK

At the time of the stock acquisition on January 1, 1957, PNW owned 69 percent of the stock of Northwest Production Corporation, being 6,664,000 shares. At that time, the stock was being traded over the counter at $6.50 per share, and the shares acquired by PNW represented a value of $43,316,000.

At the time of the stock acquisition, Northwest Production was engaged in the exploration for and production of gas in the San Juan Basin and had had some leases on which some wells had been drilled. It is selling natural gas to El Paso, but these contracts will be transferred to New Company at the time of the divestment.

Northwest Production also owns a gasoline plant located in the Permian Basin in West Texas which is owned by a company called Barnhart, which is a wholly-owned subsidiary of Northwest Production.

El Paso now owns 90 percent of the stock of Northwest Production, the balance of the stock having been acquired since El Paso's stock acquisition of PNW.

Northwest Production does not have any assets of any consequence, other than the leases and the gasoline plant in the Permian Basin.

The Northwest Production acreage has been disappointing and although there has been some wildcat drilling, the majority of its drilling activity has been in the development of proven acreage.

The capital investment of the company is far in excess of the earnings and it operates at a loss. (See Annual Report, El Paso Exhibit 39.)

## BELCO PETROLEUM CORPORATION NOTES

In 1957, when El Paso was undertaking to acquire additional reserves in the Big Piney area for the northwest division, El Paso entered into a contract with Belco Petroleum to make advances of funds to be used by Belco for the drilling of wells in the Big Piney area. The agreement called for a line of credit to be extended by El Paso to Belco of $8,750,000. Belco only availed itself of a little over $2,000,000 which is payable to El Paso from 50 percent of the production of the wells drilled, and any balance remaining unpaid on December 31, 1975, becomes due and payable at that time. The balance due at the end of 1967 was $1,125,000. El Paso proposes to divest these notes to New Company. Belco Petroleum is a successful oil producer, and its stock is traded on the New York Exchange. On October 16, 1967, this stock was selling for $43.00 a share.

The Court finds that it would be to the best interest of New Company for El Paso to divest these notes to it.